**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CAMERON LACROIX | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| AMAZON.COM SERVICES LLC | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Cameron Lacroix, proceeding pro se, as and for his Complaint against Defendant Amazon.com Services LLC, states and alleges as follows:

**PRELIMINARY STATEMENT**

1. This case arises from what happened when a successful Amazon employee returned from approved mental-health-related leave, reported workplace misconduct and harassment concerns, and was immediately treated as a security and medical problem instead of as an employee seeking help.

2. Plaintiff Cameron Lacroix began at Amazon in 2021 as a part-time Whole Foods Grocery Shopper and advanced through multiple promotions into a salaried Level 4 Program Manager role at Amazon's BOS21 office in Boston, Massachusetts.

3. Before the events at issue, Plaintiff had no formal discipline, no Performance Improvement Plan, no warning that his job was in jeopardy, and a record reflecting trust, promotion, responsibility, and successful performance.

4. In September 2025, Plaintiff took approved leave for mental and physical exhaustion and disclosed anxiety, depression, and related mental-health concerns to Amazon through management, Disability and Leave Services, and internal systems.

5. Plaintiff returned to work during the week of November 24, 2025 expecting to resume his duties and continue his career progression. Instead, within days, he became alarmed by

- 1 -

workplace conversations and conduct he believed involved confidential information, investigations, intimidation, harassment, retaliation, and matters concerning him.

6. On December 4, 2025, Plaintiff recorded rogue federal agents near BOS21 discussing a plan to grab his cell phone and smash it. The cell phone contained audio and video recordings of Matthew Dolan and statements suggesting that agents could do anything they wanted to Plaintiff. Plaintiff told his manager that he was experiencing panic symptoms, that he needed to leave work early, and that he also had experienced a distressing elevator incident in which two men made him feel boxed in and trapped. That same day, he filed an Ethics complaint reporting harassment, intimidation, retaliation, disability-related treatment, disclosure of confidential information, and severe emotional distress.

7. Less than twenty-four hours later, Plaintiff was directed into a BOS21 conference room, questioned about his mental health, psychiatric treatment, diagnoses, medications, and providers, denied permission to leave or obtain water, evaluated by emergency medical personnel, removed from the workplace by police, placed on paid suspension, and placed into a Fit for Duty process.

8. Amazon then kept Plaintiff out of active work for approximately five and a half months while describing his status in shifting ways: paid suspension, Fit for Duty, confidential investigation, administrative leave, and leave of absence. Plaintiff repeatedly asked what he was accused of, what was being investigated, when he could return, and whether his Ethics complaints were being addressed. Amazon, it's Human Resources and Disability and Leave Services ("DLS") communications, including communications from HR Business Partner Alyse Griswold and Case Manager Sol Montero, failed to provide clear and consistent answers.

9. Plaintiff suffered severe emotional distress, crisis stabilization, psychiatric treatment, financial hardship, reputational harm, system-access problems, benefit-related disruption, lost promotion opportunity, delayed stock or RSU-related compensation, career-progression harm, and ongoing trauma-related symptoms.

10. On May 20 2026, Amazon returned Plaintiff to active employment in good standing but did not start work until May 26, 2026 due to an unremovable security control on his work laptop. A senior Human Resources representative acknowledged that the process had taken substantially longer than expected, apologized, and stated that he wished Plaintiff had felt more supported. The representative informed Plaintiff that he could not articulate why this had happened to him and added that he wasn't even sure he could reveal the reason.

11. Plaintiff alleges that Amazon's conduct violated the Americans with Disabilities Act, Massachusetts General Laws Chapter 151B, and Massachusetts common law by retaliating against him for protected activity, discriminating against him because of actual or perceived disability, subjecting him to impermissible disability-related inquiries and medical review, falsely imprisoning him, and causing severe emotional distress.

## PARTIES, JURISDICTION, VENUE, AND EXHAUSTION

12. Plaintiff Cameron Lacroix is an individual residing in Massachusetts.

13. At all relevant times, Plaintiff was employed by Defendant Amazon.com Services LLC.

14. Defendant Amazon.com Services LLC is a Delaware limited liability company doing business in Massachusetts and was Plaintiff's employer during the relevant period.

15. Defendant maintained and operated Plaintiff's workplace at BOS21, located at 55 Pier 4 Boulevard, Boston, Massachusetts.

16. At all relevant times, Defendant was an employer within the meaning of the Americans with Disabilities Act and Massachusetts General Laws Chapter 151B.

17. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

18. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367.

19. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the detention, questioning, suspension, and return-to-work events at BOS21.

20. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Charge No. 523-2026-00713, alleging disability discrimination, retaliation, and related misconduct.

21. On March 19, 2026, the EEOC issued a Determination and Notice of Rights. Plaintiff timely brings this action and has exhausted the administrative prerequisites for the federal claims asserted herein.

## AMAZON'S POLICIES AND REPRESENTATIONS

22. Amazon tells employees that it strives to be 'Earth's Best Employer' and that leaders should create a safer, more productive, more diverse, and more just work environment.

23. Amazon represents that employees should be treated fairly and with respect, that leaders should listen attentively and speak candidly, and that employees may raise concerns through management, Human Resources, and Ethics channels.

24. Amazon's policies instruct employees to report harassment or inappropriate workplace conduct to a manager or Human Resources and state that concerns brought to Human Resources will be reviewed and, when appropriate, acted upon.

25. Amazon also maintains extensive internal systems for security, People eXperience Technology ("PxT") or ("HR"), an Ethics Hotline, Global Risk and Intelligence Services

("GRIS"), Amazon Corporate Security ("ACS"), Business Assurance Center ("BAC"), Global Security Operations Center ("GSOC") and others.

26.   Plaintiff alleges that those representations created a reasonable expectation that Amazon would protect an employee who disclosed disability-related needs, reported harassment or retaliation concerns, and sought help during acute distress.

27.   Plaintiff alleges that Amazon did the opposite: it turned its systems against him by detaining him, questioning him about private mental-health matters, removing him from the workplace, restricting his access, and keeping him in prolonged uncertainty.

## PLAINTIFF'S EMPLOYMENT HISTORY AND DISCLOSED MENTAL-HEALTH CONDITIONS

28.   Plaintiff began working for Amazon on April 3, 2021, as a part-time Whole Foods Grocery Shopper.

29.   On October 17, 2021, Plaintiff was promoted to a Level 2 Delivery Station Liaison position at Amazon's delivery station in Dedham, Massachusetts.

30.   On March 27, 2022, Plaintiff was promoted to a Level 3 Field Quality Assurance Specialist position handling high-level delivery defects and operational escalations across multiple Massachusetts locations.

31.   On September 9, 2023, Plaintiff was promoted into a Level 4 supervisory role titled Lead, On Road Execution, where he oversaw evening operations, directed a small team, and secured the site at the end of his shift.

32.   On April 4, 2024, after a competitive four-round interview process and support from prior managers, Plaintiff was promoted into a salaried Level 4 corporate role as Program Manager I.

33.   As Program Manager I, Plaintiff was based at BOS21 and assigned to Amazon's Customer Experience Operations ("CXO") organization within Worldwide Stores.

34.   At the time of this writing CXO has since been merged into Worldwide Returns and ReCommerce and Plaintiff now supports Reverse Logistics Services ("RLS").

35.   Plaintiff had no formal discipline before the events described in this Complaint, had never been placed on a Performance Improvement Plan, and had not been told that his job was in jeopardy.

36.   Plaintiff received his first Organization and Leadership Review ("OLR") towards the end of 2024, which yielded a performance rating of Meets High Bar. Plaintiff's manager Kaylie Richter informed him that he did very well, but that he could not receive a higher rating due to "red tape" as he had not been on the team long enough.

37. In or around August 2025, Plaintiff's manager, Svetlana Gladkaya, informed Plaintiff that she was working on his promotion documents, which Plaintiff understood required Level 6 stakeholder feedback and likely Director approval.

38. At the time Plaintiff commenced leave in September 2025, Plaintiff understood that he was on a promotion trajectory and that Amazon was evaluating him for advancement from his Level 4 Program Manager role. Plaintiff had been a Level 4 employee for two years split between two roles.

39. Plaintiff alleges that the December 2025 suspension, Fit for Duty process, confidential investigation, administrative leave, and prolonged return-to-work delay interrupted and derailed the promotion process that had begun before his leave.

40. Plaintiff further alleges that the suspension and prolonged exclusion from active work delayed at least one stock or restricted stock unit ("RSU") vesting-related award and caused lost promotion opportunity, lost career progression, lost seniority among peers, and other employment-related economic losses.

41. After working on September 5, 2025, Plaintiff commenced an approved leave of absence due to mental and physical exhaustion.

42. Plaintiff disclosed mental-health concerns to Amazon, including anxiety and depression, and provided documentation showing that he was seen at Boston Medical Center on September 16, 2025 for treatment.

43. Through Plaintiff's Disability Self-Identification Form, medical documentation, communications with management, Disability and Leave Services records, and internal security reports, Amazon knew before December 2025 that Plaintiff had reported mental-health conditions and had recently taken leave for those conditions.

44. Plaintiff's leave ended on November 20, 2025. He used paid time off on November 21, 2025 and returned to work during the week of November 24, 2025.

45. Upon his return, Ms. Gladkaya welcomed Plaintiff back, told him to take it easy and indicated that they would have a one-on-one meeting the following week.

46. At the time he returned, Plaintiff remained in good standing and expected to resume his duties. There was no discussion of discipline, misconduct, work restriction, or the promotion that had been discussed in August 2025.

47. Plaintiff alleges that no one informed him that the promotion process had ended before the December 2025 events. Plaintiff expected to continue working toward promotion and continued career growth after returning from leave.

**SECURITY REPORTS BEFORE PLAINTIFF'S RETURN**

48. On September 4, 2025, Plaintiff reported to Amazon IT personnel that his Amazon-issued laptop had indicated that Windows' Local Security Authority service had been disabled leaving it vulnerable to attack. Plaintiff did not make any modifications to his system to cause this. OTS Ticket No. V1925957930

49. On September 7, 2025, Plaintiff escalated a cybersecurity and workplace-security concern to AWS Corporate Security through Ticket No. CORPSEC-234075.

50. In that report, Plaintiff described concerns involving suspicious device activity, possible compromise of his Amazon-issued work machine, and a fear that a leak could compromise his organization.

51. On September 13, 2025, Plaintiff supplemented CORPSEC-234075 and expressly disclosed that he was on leave for physical and mental exhaustion due to anxiety and depression. Plaintiff noted that a man sitting at BOS21.05.790.F1 would constantly look at him and that he could be an insider threat.

52. Through CORPSEC-234075, Amazon possessed enough information about Plaintiff's disability concerns before he returned to work from his self-initiated leave months later.

**RETURN FROM LEAVE AND EVENTS LEADING TO THE ETHICS COMPLAINTS**

53. On November 19, 2025 Plaintiff filed a complaint in a separate federal action, Lacroix v. Leatherman, Civil Action No. 25-cv-13452, in the United States District Court for the District of Massachusetts. The complaint alleged that rogue agents, including Barton Miller aka B.M. subjected him to psychological warfare which damaged his mental health.

54. On November 24, 2025 Plaintiff submitted an amended complaint with allegations which detailed suspicious encounters with neighbors who were actually undercover agents. Plaintiff became concerned that one of them might've been a sex offender which caused him to research him to ensure his daughter's safety.

55. In the days immediately following the filing of the amended complaint, Plaintiff became attentive to workplace conversations and events that he believed might relate to the allegations in that pleading.

56. Plaintiff includes the allegations concerning rogue federal agents, undercover activity, surveillance, and the separate federal action because they formed the context for his reports to Amazon, his mental-health distress, and Amazon's notice of disability-related concerns. Plaintiff does not ask this Court to adjudicate the separate federal action in this case. Plaintiff alleges here that Amazon's response to his workplace reports, disability disclosures, Ethics complaints, medical information, suspension, investigation, and return-to-work process violated employment and common law protections.

**MATTHEW DOLAN'S ROLE IN PLAINTIFF'S REPORTS AND DISTRESS**

57. Matthew Dolan is a central figure in this case because Plaintiff alleges that Dolan's open workplace conversations and electronic communications were the immediate source of Plaintiff's December 2025 workplace reports, panic symptoms, and Ethics complaint.

58. Plaintiff alleges that Dolan was not merely an incidental coworker. Plaintiff understood Dolan to be involved in or coordinating with internal investigators and federal investigators concerning matters involving Plaintiff, including confidential investigation matters and efforts to obtain or control evidence.

59. Plaintiff alleges that Dolan's conversations were reckless and harassing because they occurred in a common work area, within earshot and view of Plaintiff and potentially others, while discussing sensitive subject matter that Plaintiff understood to concern him, including federal law enforcement, searches, confidential investigation matters, and allegations involving "distribution and a dead body."

60. Plaintiff alleges that when he reported Dolan's conduct through Amazon's Ethics process, he was reporting what he believed to be confidentiality breaches, harassment, intimidation, unlawful surveillance or investigation conduct, retaliation, and evidence-related misconduct.

61. On November 25, 2025, Plaintiff was seated at a Scrum table on the fifth floor of BOS21, between rows of desks known as 790.F and 390.A, which is a common area.

62. Plaintiff observed a man seated at a desk that did not belong to him known as BOS21.05.790.F1. This was the same desk which Plaintiff flagged months earlier to AWS Corporate Security in escalation CORPSEC-234075.



**Mr. Dolan chatting on WhatsApp 11/25/25 @ 9:36A.M.**

63. Plaintiff saw Mr. Dolan join an Amazon Chime video call with a white male named Carter who stated he was talking to him from Austin, Texas. This occurred around 10:30 a.m.

64. Plaintiff heard Mr. Dolan tell Carter, "Very next week, big meeting, HR, BD, all the product folks." HR is a reference to Human Resources and Plaintiff believes BD is a reference to Business Development. Plaintiff alleges that the latter title has been used by individuals involved in covert activities such as Matthew Dolan and Rafik Awad.

65. Plaintiff heard Mr. Dolan say that his healthcare endeavor would sunset because there wasn't anything there. Plaintiff heard him say that his biggest personal fear about the whole thing was that he had been the person leading it.

66. Plaintiff heard Mr. Dolan state that he had been told to obtain a certain amount of personal engagement, but that the engagement was later deemed insufficient. Plaintiff heard Mr. Dolan express frustration and say words to the effect that "they should have made the way the goal about" it and the requirement to proceed very clear. Plaintiff understood this to mean that he felt that he did what he was supposed to do but he didn't get what he wanted.

67. Plaintiff heard Mr. Dolan say that the one silver lining about everything was that "we have time." Plaintiff also heard Mr. Dolan tell Carter that he was still employed by AWS Solutions and that he had not been demoted.

68. Plaintiff understood the references to continued employment and not being demoted as potentially referring to Plaintiff's own employment status.

69. Plaintiff further heard Mr. Dolan state words to the effect of, "hey, you all kind of put me in a tough spot," and admit that he should have stayed with the existing pipeline but he kept pushing instead.

70. Plaintiff understood Mr. Dolan's reference to "pushing" to mean that he had regretted deviating from the norm and it caused a problem.

71. Plaintiff also heard a reference to federal law enforcement, his lawsuit against the FBI, and statements suggesting that Amazon had been unfairly targeting him for years through the use of undercover employees positioned around him.

72. From the common area where he sat, Plaintiff could see Mr. Dolan's screen, which alternated between Amazon Chime, Slack, WhatsApp, and other applications.

73. On December 2, 2025, Plaintiff observed Mr. Dolan join an Amazon Chime meeting. The title was "Matt D/Anthony Qtrly 1:1". Based what he saw on his screen Plaintiff believes the individual was likely Anthony Leggett, a Level 8 Director-level employee.



74. Someone in the vicinity of Plaintiff captured on recording said "I think Cameron's watching you, I can see him in your camera," followed by, "I doubt he understands what I'm talking about anyway."

75. Plaintiff heard Mr. Dolan say "they can do whatever they want to him" seemingly because he had been associated with "distribution and a dead body". Mr. Dolan also cited an issue related to a military officer's reputation being negatively impacted. Mr. Dolan said that he's seen "too much evidence to buy that", relating to the opinions of others not aligning with his view of Plaintiff.

76. Plaintiff had never engaged in homicide or the selling of contraband. He found those statements difficult to reconcile with an ordinary workplace conversation and this triggered his anxiety which Amazon knew about. Furthermore, Plaintiff had long ago disclosed that he had a disability or had one in the past using the Amazon AtoZ Disability Self-Identification Form.

77. Plaintiff heard Mr. Dolan tell Anthony that he knew he had seen the news about certain officers. Mr. Dolan said that he guaranteed that they were going to be impacted. Plaintiff believes that Mr. Dolan was referring to a portion of his lawsuit where he asserted that an undercover cop was a sexual predator. Plaintiff also believes that Mr. Dolan and rogue agents had took steps to frame Plaintiff as a sex offender which was in direct conflict with Plaintiff's character and the evidence in his Gmail account (emails).

78. Plaintiff alleges that Dolan's comments caused Plaintiff to fear that he was being targeted for serious criminal accusations and that Amazon knew or should have known that such open investigative conversations could foreseeably cause severe anxiety and distress.

79. Following the call with Anthony, Mr. Dolan began speaking on a cell phone with a female around 11:57AM. Plaintiff heard Mr. Dolan say "I told him about tomorrow and just said to make sure it's in action. They want me in his room today". She asked "what's that, the search?" He said yes.



**Mr. Dolan talking on the phone 12/2/25 @ 11:57A.M.**

80. Plaintiff watched Mr. Dolan look through a WhatsApp chat after he told the female that he told a male individual about tomorrow. According to WhatsApp transcripts, the individual speaking to Mr. Dolan said things that they were sad but after a few messages wrote "we'll be ready, that won't take long right?".

81. Mr. Dolan scrolled further down and Plaintiff saw a screen shot of a chat with Geoff who said, "Look, I know this is frustrating. I get the dynamics here. But at this point." The person Mr. Dolan was speaking to said, "I'm pissed." Mr. Dolan said, "I think Geoff is right," adding that someone was not going to take action "going back and forth." There was

82. Plaintiff alleges that Dolan's remarks and visible screen activity exposed what Plaintiff understood to be inside motives behind the investigation and suggested that Amazon personnel or individuals working with them were discussing how to proceed against Plaintiff, how to search or obtain evidence, and how to avoid or delay action.

83. At approximately 9:50 p.m., Plaintiff posted to social media "I #pray to #God that NOBODY has to go through the mental anguish the ive suffered at the behest of the @FBI .

I am so close to putting a specific person on front street for saying some SUPER sensitive (no name) things that I even have on tape but I'm hoping the US Attorney notices that this REALLY happened. 25-cv-13452 Lacroix v. Leatherman @AGPamBondi @DAGToddBlanche".

### DECEMBER 3, 2025 OBSERVATIONS AND CONTINUED DISTRESS

84.    On December 3, 2025, at approximately 8:50 a.m., Plaintiff observed what he believed to be law-enforcement surveillance near the Amazon office. There was a black SUV with flashing lights mounted in its grille parked on the sidewalk near BOS21.

85.    Plaintiff recorded the encounter and grew anxious, feeling that it was being done on purpose because he had noticed surveillance agents watching him in the office earlier that week.

86.    At approximately 8:52 a.m., Plaintiff saw another unmarked law-enforcement vehicle drive past the front of BOS21 before he entered.

87.    Plaintiff observed individuals following him prior to entering the building in addition to seeing said vehicles.

88.    At approximately 9:44 a.m., Plaintiff posted to social media "FBI agents will be sitting for an interview next month due to the investigation stemming from what I have alleged. I hope they talk to me specifically because this is a much wider conspiracy involving others at a technology company who may not be subject to sit. @AGPamBondi  @JusticeOIG".

89.    The post was a direct reference to something Plaintiff heard Mr. Dolan talk about the day prior, namely, that investigators had been summoned to an interview which would take place on January 5, 2026.

90.    Plaintiff overheard Mr. Dolan talking on December 3, 2025 and, other than observing vehicles and surveillance, did his best to do his job.

91.    Plaintiff alleges that the December 3 observations and his contemporaneous recording and social-media posts reflected his increasing anxiety, hypervigilance, and belief that events outside and inside BOS21 were all connected to the workplace concerns which he soon reported.

### DECEMBER 4, 2025 EVENTS, REPORT TO MANAGEMENT, AND ETHICS COMPLAINT

92.    On December 4, 2025, Plaintiff was seated behind Mr. Dolan in a common area at BOS21.

93.    Plaintiff observed Mr. Dolan drafting a document in Microsoft Word while referencing Quip.

94.    At approximately 12:16 p.m., Plaintiff observed Mr. Dolan searching Google for information concerning the Dallas-Fort Worth area.

95.    Around 1:15 p.m., Plaintiff believes he had returned to his desk.

96.    Plaintiff posted to X.com, "Just go over to the tree and seeing what you can grab is usually not a good idea," which Plaintiff intended as a reference to unsupported allegations and his concern that investigators were pursuing him.

97.    Plaintiff noticed Phillippe Mirandl, an undercover Amazon employee, seated diagonally from him at BOS21.05.790.B3 had been speaking loudly on a call.

98.    Within minutes, Plaintiff realized that Mirandl was speaking with Dolan.

99.    Plaintiff heard Mirandl say words to the effect of, "I have a great idea, how do you feel about temporary protection status right now?"

100.    Plaintiff heard Dolan reply, "I'm aligned."

101.    Plaintiff heard Mirandl state words to the effect of, "Okay, I'll set the operation up. How does between 3:00 and 4:00 PM sound?"

102.    Plaintiff heard Dolan respond, "Good."

103.    Plaintiff observed Mirandl stand up and remove his headset.

104.    Plaintiff waved and said, "Hey Phillippe, how's it going?"

105.    Mirandl responded, "Hey Cam, I'm doing good."

106.    Plaintiff then observed Mirandl walk toward the kitchenette which is beside the elevators.

107.    On or around 2:27 p.m., Plaintiff badged out of BOS21 to pay the parking meter.

108.    In the lobby, Plaintiff observed a line of individuals whom he did not recognize as Amazon employees as they did not have badges.

109.    After renewing his parking meter, Plaintiff stopped near the Boston Wharf Road and Seaport Boulevard intersection and noticed a group of individuals wearing yellow Verizon vests.

110.    Plaintiff overheard discussion that he understood to concern assembling a team and a desire to "wrap it up quick". Some of them would be positioned at the front while some at the rear. Plaintiff knows that these were law enforcement officers.

111.    Plaintiff observed a heavyset man drawing a shape with his finger.



112.    Plaintiff heard one man ask "F1? That's the location in front of F1, right?"

113.    Plaintiff understood the reference to "F1" as potentially relating to workstation BOS21.05.790.F1 and believed the individuals were the federal agents working with Mr. Dolan.



114.    At approximately 2:36 p.m., Plaintiff began recording the individuals on his phone.

115.    Plaintiff observed a woman ask aloud "don't break it?" whom the presumed leader of the operation said "that's the last resort, you gotta run the tale somehow".

116.    Plaintiff observed some individuals laugh, while another officer or agent whom Plaintiff understood to be named Tom appeared worried.

117.    An agent with dark hair who had conducted physical surveillance of Plaintiff at different points in time walked over and said "Tom, it's all gonna go smooth". Plaintiff observed Tom gesture toward Plaintiff, and the agent no longer spoke loudly.

118.    Plaintiff alleges that the individuals reaffirmed their interest in obtaining Plaintiff's phone. Based on his public X posts stating that he had a recording, Plaintiff understood the individuals to be interested in seizing the device and, if necessary, breaking or destroying it to prevent preservation or disclosure of evidence because the recording demonstrated what Plaintiff understood to be statements that agents "could do whatever they want to him."

119.    Plaintiff alleges that this reinforced his belief that the objective was to obtain his phone, break or destroy it if necessary, and prevent preservation of evidence. Plaintiff alleges that after he complained about Dolan's conduct, Amazon did not protect him or promptly investigate Dolan's conduct in a transparent way; instead, Amazon separated Plaintiff from the workplace through suspension, Fit for Duty, a confidential investigation, worksite restrictions, and system-access restrictions.

120.    Plaintiff walked up Boston Wharf, took a left on Autumn Lane, and stopped near a loading dock, where he observed two law-enforcement-looking individuals with a muzzled dog.

121.    Plaintiff heard the man instruct the woman to grab Plaintiff's phone while it was on.

122.    Plaintiff heard the woman ask how that would occur, and Plaintiff understood the plan to involve creating a commotion with two dogs.

123.    Plaintiff heard words to the effect of, "that's when they'll go in."

124.    When the individuals noticed Plaintiff, they went quiet and walked away.

125.    Plaintiff continued toward Amazon while feeling extremely nervous.

126.    Plaintiff returned to BOS21 and entered the lobby elevator.

127.    Two men in the elevator acted in a manner Plaintiff perceived as aggressive and excited.

128.    Plaintiff heard one man say words to the effect of, "I can't wait for it, today is going to be a good day."

129.    Plaintiff was positioned in a corner of the elevator with little space and was uncomfortable because of what he had learned was about to happen to him.

130.    Plaintiff asked one of the men for the time, and the man stated that it was 3:00 p.m.

131.    Plaintiff exited the elevator on the fifth floor and began packing his desk.

132.    Program Manager Juan Grossman, who sat at BOS21.05.790.B1 asked Plaintiff where he was going. Mr. Grossman had personally told Plaintiff that he was interested in obtaining a green card due to his work at Amazon. Additionally, another Program Manager Anthony Tamer told Plaintiff that he would do anything for a green card during the summer of 2025.

133.    Plaintiff said that he was going downstairs to enjoy some freedom, and Mr. Grossman acknowledged him.

134.    Plaintiff entered the cafeteria on the third floor and sat at the edge of a bench, against a wall.

135.    Plaintiff joined a video call with colleagues and began drafting an Ethics complaint concerning Mr. Dolan and workstation BOS21.05.790.F1.

136.    Plaintiff messaged his manager, Svetlana Gladkaya, reporting harassment and symptoms consistent with a panic attack.

137.    Plaintiff advised Ms. Gladkaya that he believed he needed to leave work early because of his deteriorating condition.

138.    Plaintiff also told Ms. Gladkaya that he had experienced an incident involving two men in an elevator whose positioning caused him to feel boxed in and trapped in a corner of the elevator.

139.    Plaintiff told Ms. Gladkaya that the elevator encounter contributed to his distress and anxiety.

140.    Plaintiff alleges that these communications placed Amazon management on notice of his workplace-related concerns, panic symptoms, anxiety, and emotional distress.

141. Around 3:13 p.m., Plaintiff submitted Ethics Complaint No. 312051695501 through Amazon's designated Ethics reporting channels.

142. In that complaint, Plaintiff reported concerns involving workplace conduct, disclosure of confidential information, retaliation, intimidation, harassment, disability-related treatment, panic symptoms, anxiety, and emotional distress.

143. Plaintiff was not exact regarding Matthew Dolan's name but he correctly identified the workstation BOS21.05.790.F1.

144. Plaintiff recalled in the report that a person named Anthony was involved and he mistakenly tagged Matthew Doden, which was slightly incorrect.

145. After submitting the complaint, Plaintiff observed an Asian male point at him and a young Asian female sit directly to his right, which increased his concern that evidence was being manufactured.

146. Plaintiff soon after left the cafeteria and his manager had given him the ok to leave.

147. Plaintiff walked to his car, slammed the door, yelled, and then cried in despair.

148. At that time, Plaintiff believed that the government intended to charge him with drug, sex, and murder offenses.

149. At approximately 4:48 p.m., Plaintiff posted to social media regarding investigators and his belief that he was being set up for termination.

150. At approximately 11:13 p.m., Plaintiff posted to social media tagging the FBI and expressing frustration over alleged false accusations.

151. At approximately 11:26 p.m., Plaintiff posted to social media tagging FBI Boston and stating that he intended to go to 201 Maple Street the following day.

152. Plaintiff expected Amazon to investigate his complaint in good faith, protect him from retaliation, and provide meaningful support given his recent mental-health leave, disclosed anxiety and depression, and then-current panic symptoms.

153. Plaintiff alleges that his December 4, 2025 communications to management and Ethics constituted protected activity under the ADA and Chapter 151B.

## DECEMBER 5, 2025 SECURITY DETENTION, MEDICAL QUESTIONING, AND REMOVAL

154. Plaintiff reported to work at BOS21 on December 5, 2025.

155. At approximately 11:33 a.m., Plaintiff's manager asked whether he was okay. Plaintiff responded that he did not feel particularly out of place that day and that nobody seemed to be 'screwing around.'

156. Between 12:13 p.m. and 12:40 p.m., less than twenty-four hours after Plaintiff submitted Ethics Complaint No. 312051695501, Plaintiff was directed to a BOS21 conference room, also known as a huddle room, identified as BOS21.05.775.A1.

157. Plaintiff entered the room, sat in the left corner, and encountered Amazon security personnel and other representatives. Security identified themselves as Mr. Scott Lancaster and Mr. T.J. Hollen.

158. Plaintiff alleges that security personnel informed him that he could not record the conversation as he requested. Plaintiff asked if he was taken because of his ethics report and T.J. said "why don't you tell us about the ethics complaint".

159. Plaintiff refused to talk about it citing confidentiality concerns and he was reminded that they were with Amazon, with T.J. showing him his yellow badge. Plaintiff continued to deny talking about it stating that they were contractors and had no right to know. Plaintiff was questioned concerning his mental-health condition, psychiatric treatment, medications, diagnoses, providers, and treatment history.

160. Plaintiff alleges that the questioning focused on private medical and psychiatric matters rather than on his ability to perform the essential functions of his job. It was not consistent with business necessity, and was not narrowly tailored to a legitimate workplace concern.

161. Plaintiff was not told that the questioning was voluntary.

162. Plaintiff requested permission to leave and requested permission to obtain water.

163. Plaintiff alleges that those requests were denied and asked if he was not free to leave.

164. Plaintiff was told no and believed he was being detained.

165. Plaintiff asked again if he could get back to work because he had an upcoming call but was told he could not leave. Amazon security personnel and others were exercising control over his movement.

166. Plaintiff alleges that he was not provided a meaningful explanation for the detention and was not informed of any workplace rule violation that justified it. Security tried encouraging Plaintiff to go to the hospital via ambulance to get checked out and he refused stating he was fine.

167. Plaintiff was asked if he would talk with emergency services personnel. He initially said he did not need to but changed his mind citing that paperwork would be helpful because he had been feeling like he was being harassed in the building. A call was placed and Boston EMS was dispatched at 12:54p.m. to BOS21.

168. EMS personnel evaluated Plaintiff. EMS records reflected that Plaintiff denied suicidal ideation, homicidal ideation, and hallucinations.

169. Plaintiff declined transportation to a hospital, and Scott Lancaster was documented as a witness to Plaintiff's refusal of transport. T.J. remarked that Plaintiff had put his cell phone

in a faraday bag which signaled to him that this was an extension of the prior day's operation to seize him and smash his cell phone.

170. Plaintiff alleges that the involvement of EMS humiliated and distressed him and reinforced the perception that Amazon was treating him as mentally unstable or medically unfit rather than as an employee who had reported workplace misconduct.

171. At approximately 1:00 p.m., Plaintiff was scheduled to participate in a business meeting with Kimberly McDonnell, Mihir Kaushik, and other members of Amazon's Reverse Logistics Services team. Plaintiff informed security that he needed to get back to work because his performance could be impacted.

172. After being released from the room, Plaintiff joined the meeting, apologized for being late, and attempted to participate.

173. While Plaintiff was on the video call, a uniformed officer entered the area visible to Plaintiff's camera, required Plaintiff to remove his headset, retrieve identification from his wallet, and hand over his identification in view of coworkers and colleagues.

174. Plaintiff alleges that this interruption was humiliating, embarrassing, and caused substantial emotional distress. He was asked to sign the EMS tablet at 1:17p.m. declining transport and did. Plaintiff felt that he was surrounded and after the call stood up and said something to the effect of "that's it I'm calling my lawyer. I'm being harassed." He called his attorney at 1:29p.m. and left a 4 minute voicemail as she was busy. EMS, Security, and others regrouped in the hallway after his announcement.

175. Mr. Lancaster returned to tell Plaintiff that they'd have the police remove him if he didn't go home but Plaintiff again said it was unnecessary. Mr. Lancaster then positioned himself to Plaintiff's left where an employee named Yidnek Tibebu sits and remained there until Plaintiff was escorted out. While Mr. Lancaster remained, present Plaintiff submitted a second Ethics complaint regarding the December 5 events, Report No. 879648890201, seeking assistance and reporting concerns about the treatment he was experiencing that day.

176. At 1:56PM a Senior Manager Nicholas Trombino had told Plaintiff "Hey Cam" and told him to go work from home for the rest of the day. When he mentioned it was an inconvenience and he didn't have Wi-Fi Trombino told Plaintiff take the day off paid, we'll catch up on Monday. Despite being assured he would return to work Monday, Amazon had Plaintiff removed from the workplace by Boston Police officers, placed him on paid suspension effective that day, initiated a Fit for Duty process, restricted his system access, and instructed him not to return unless authorized by Human Resources. Alyse Griswold, a Regional Senior Human Resources Business Partner, communicated the paid suspension, Fit for Duty process, and no-return instruction to Plaintiff that same day. These events suggested to Plaintiff that if he had gone home then he might have been harmed in some way.

177. Plaintiff alleges that Amazon's response effectively eliminated him from the workplace and restricted his access to coworkers, systems, documents, and evidence after he complained about Dolan's conduct and the effort Plaintiff believed was aimed at seizing or destroying his phone.

## SUSPENSION, FIT FOR DUTY, INVESTIGATION, AND PROLONGED UNCERTAINTY

178. Plaintiff alleges that the detention, medical questioning, suspension, and Fit for Duty process occurred immediately after he engaged in protected activity and supports an inference of retaliation.

179. Plaintiff sought clarification concerning the factual basis for the suspension, the allegations being investigated, the expected duration, and what he needed to do to return to work.

180. Amazon did not provide a clear, timely, and consistent explanation.

181. At various points, Amazon described Plaintiff as on paid suspension, in a Fit for Duty process, subject to a confidential investigation, or on administrative leave.

182. Plaintiff cooperated with the Fit for Duty process, complied with requests for medical documentation, participated in evaluations, and repeatedly expressed that he wanted to remain employed and return to work once authorized.

183. Plaintiff alleges that he never refused to participate in the Fit for Duty process.

184. By the afternoon of December 5, 2025, Plaintiff had been escorted from BOS21 and was no longer present at the workplace.

185. At approximately 4:05 p.m. that day, Ticket No. CORPSEC-234075 was accessed by Matthew Lou, an Investigative Analyst within Amazon's Global Risk and Intelligence Services organization.

186. When asked to provide a business justification for reviewing the report, Mr. Lou entered 'GRIS investigation.'

187. Plaintiff alleges that the timing of this access is significant because CORPSEC-234075 contained Plaintiff's disability disclosure, anxiety, depression, leave status, security concerns, and prior identification of workstation BOS21.05.790.F1.

188. Plaintiff alleges that Amazon used or considered information from CORPSEC-234075 while treating him as the subject of security, medical, and investigative processes rather than as an employee who had reported workplace concerns and requested assistance.

189. During December 2025, Amazon informed Plaintiff that a confidential investigation was being conducted concerning the events of December 5 and that Plaintiff remained prohibited from returning while the investigation was active.

- 18 -

190. Plaintiff repeatedly requested updates, the allegations being investigated, whether findings had been made, and an opportunity to provide his version of events and discuss his Ethics complaints.

191. Despite representing that investigators would gather information and consider Plaintiff's concerns, Amazon did not provide timely interviews, meaningful updates, or a clear resolution for months.

192. Plaintiff remained uncertain whether his complaints had been substantiated, rejected, or ignored, whether Amazon believed he violated any rule, and whether he would be returned to work.

193. On or about December 7, 2025, Plaintiff informed Amazon that he was seeking medical treatment, experiencing significant anxiety, had sought crisis counseling, and was considering inpatient treatment.

194. Plaintiff also advised Amazon that system restrictions were interfering with his ability to access employment resources, accommodation options, benefits information, and related support.

195. In January and February 2026, Plaintiff continued to experience pay, access, benefit, and Human Resources failures while he remained out of work.

196. Plaintiff advised Amazon that he had not received regular salary payments for several weeks, was experiencing severe financial hardship, feared eviction, was accumulating debt, and needed urgent clarification and assistance.

197. Plaintiff alleges that Amazon knew of these problems and yet failed to resolve them in a timely, clear, and consistent manner.

198. Plaintiff repeatedly sought updates concerning Ethics Complaint Nos. 312051695501 and 879648890201, but remained largely in the dark regarding the status of those complaints.

**HUMAN RESOURCES COMMUNICATIONS FROM ALYSE GRISWOLD**

199. On December 5, 2025, after Plaintiff had been questioned by security personnel, evaluated by EMS, removed from the workplace, and instructed to leave BOS21, Amazon Human Resources representative Alyse Griswold emailed Plaintiff and stated that Amazon was following its Fit for Duty process. Ms. Griswold informed Plaintiff that he was being placed on paid suspension effective December 5, 2025, and that he was not to return to work unless directed by the CXO PxT Team.

200. On December 6, 2025, Plaintiff asked Ms. Griswold to explain why security had approached him, stated that security had connected the encounter to his Ethics complaint from the day before, reported that he had been denied permission to obtain his own water while in a huddle room, reported that he had been rushed while using the restroom, and explained that a

badge had been placed in front of him during a business call, causing embarrassment in front of coworkers.

201.    On December 7 and 8, 2025, Plaintiff told Ms. Griswold and Amazon Human Resources that his AtoZ access had been disabled, that he could not access MyHR, benefits information, accommodation options, or leave resources, and that he was seeking medical attention. Ms. Griswold responded that Plaintiff's case was still under active review through the Fit for Duty process, but did not provide a clear factual explanation for the suspension, the alleged policy violation, the expected duration, or the steps required for Plaintiff to return to work.

202.    On December 8 and 9, 2025, Plaintiff informed Ms. Griswold that he was experiencing serious anxiety after being interrogated and removed from work, that he had met with a crisis counselor, and that inpatient or crisis-stabilization treatment was being considered. Amazon therefore had actual notice that its December 5 response and the resulting uncertainty were causing Plaintiff severe emotional distress and interfering with his ability to access benefits and employment resources.

203.    On or about December 15, 2025, Plaintiff told Ms. Griswold that his nurse-practitioner and psychiatry team recommended returning to work because work was healthy for him and because Plaintiff could manage his health through medication and treatment. Plaintiff also asked whether there was anything else he needed to do and whether he would be able to return when the review or leave period ended.

204.    On or about December 17, 2025, Ms. Griswold informed Plaintiff that even if the Fit for Duty or Disability and Leave Services process closed, Plaintiff was still not permitted to return to work because of a "Confidential Investigation related to the 12/5 incident." Ms. Griswold further warned that any attempt to access an Amazon site could potentially result in disciplinary action.

205.    Plaintiff alleges that these communications show that Amazon's Fit for Duty process, paid suspension, confidential investigation, worksite ban, and access restrictions became intertwined and were used to keep Plaintiff out of active work without a clear, timely, or consistent explanation, despite Amazon's knowledge of Plaintiff's disability-related leave, mental-health disclosures, protected complaints, and worsening emotional distress.

## AMAZON'S FITNESS FOR DUTY PROCESS AND DEVIATION FROM ITS OWN PROCEDURE

206.    Amazon maintains a Fitness for Duty ("FFD") process for circumstances where a manager or People Experience & Technology ("PxT") Business Partner has a concern that an employee may present a significant workplace safety risk to themselves or others, or certain risks to Amazon or Amazon customers.

207.    Amazon's FFD materials state that, when an employee's manager or PxT team is concerned that an employee may present a significant workplace safety risk to themselves or

others, or present a risk to Amazon or Amazon customers, once the employee is safe, a consult is sent to Disability and Leave Services ("DLS") to start the FFD process.

208.    Amazon's FFD materials further state that acts and threats of violence should be investigated first as misconduct, and that FFD following an investigation is appropriate only in exceptional circumstances.

209.    Amazon's FFD materials also state that, if the employee is determined to be safe to return to work by the Employee Assistance Program or other appropriate evaluator, the site provides the employee with Resources for Living materials and allows the employee to return to work. In that circumstance, no FFD is opened.

210.    On December 5, 2025, Plaintiff was assessed by emergency medical personnel at BOS21 and was ultimately cleared to return to his desk and continue working. Plaintiff did return to his desk and continued working after the assessment.

211.    Despite Plaintiff being cleared to return to work, Amazon escalated the matter. Security and Human Resources then instructed Plaintiff to leave the workplace, barred him from returning, placed him on paid suspension, and initiated a Fit for Duty process.

212.    Plaintiff alleges that Amazon did not follow its own FFD procedure. Once Plaintiff was assessed and permitted to return to work, Amazon should not have escalated the matter into a prolonged FFD, paid suspension, confidential investigation, and worksite ban absent a legitimate, individualized, job-related, and business-necessity basis.

213.    Plaintiff further alleges that Amazon improperly used the FFD process as a substitute for explaining what misconduct, if any, Plaintiff was accused of committing. To the extent Amazon believed Plaintiff had engaged in misconduct, Amazon's own materials required that alleged misconduct be investigated as misconduct first, not converted into a disability-related medical process.

214.    Plaintiff alleges that Amazon's use of the FFD process was not a neutral safety measure. Rather, Amazon initiated and prolonged the FFD process immediately after Plaintiff reported harassment, confidentiality breaches, retaliation concerns, disability-related concerns, and severe emotional distress. Amazon then used the process to keep Plaintiff out of active work, restrict his access to Amazon sites and systems, and avoid providing a clear explanation of the allegations against him.

215.    Plaintiff alleges that Amazon's deviation from its own FFD process supports an inference that the stated safety rationale was pretextual and that Amazon's actual conduct was retaliatory, disability-based, and inconsistent with the ADA, Massachusetts General Laws Chapter 151B, and Amazon's own policies.

**MEDICAL CRISIS AND TREATMENT**

216. Following the events of December 5, 2025, Plaintiff experienced worsening anxiety, fear, sleep disruption, hypervigilance, trauma-related symptoms, and fear of being grabbed, detained, or confronted again.

217. On December 7, 2025, Plaintiff presented for crisis evaluation and reported severe stress and anxiety related to workplace events.

218. Medical providers determined that Plaintiff required additional treatment and stabilization, and Plaintiff was admitted for psychiatric treatment and crisis stabilization.

219. Plaintiff received psychiatric care, medication management, counseling, therapeutic services, and treatment planning.

220. Medical providers diagnosed Plaintiff with Unspecified Trauma- and Stressor-Related Disorder.

221. Plaintiff alleges that Amazon's December 5 conduct and its handling of the suspension, investigation, Fit for Duty, access, pay, benefits, and return-to-work processes were substantial contributing factors to his need for crisis intervention and continued treatment.

222. Plaintiff incurred medical expenses and treatment-related costs and continues to experience emotional effects associated with the events described herein.

## RETURN-TO-WORK PROCESS AND CONTINUING HARM

223. By early April 2026, Plaintiff had completed the requirements associated with Amazon's Fit for Duty process and remained willing to return to work.

224. On April 6, 2026, Amazon Disability and Leave Services informed Plaintiff that his leave had ended, that he was expected to return on his next scheduled workday, and that Amazon looked forward to his return.

225. Plaintiff understood that communication to mean that he had been cleared to return and prepared to resume his duties.

226. Plaintiff did not refuse to return. He raised concerns about returning around certain individuals whom he believed contributed to the December 2025 events and asked Amazon to address those concerns.

227. Shortly after Plaintiff raised those concerns, Amazon informed him that additional review remained necessary and again prevented him from returning to active work.

228. On or about May 19, 2026, Plaintiff spoke with Jerry Martinez, a Regional Senior Human Resources Business Partner employed by Amazon.

229. Mr. Martinez informed Plaintiff that Amazon had completed its review and intended to return Plaintiff to active employment status.

230. Mr. Martinez acknowledged that the process had taken substantially longer than expected, apologized, and stated that he wished Plaintiff had felt more supported throughout the process.

231. Mr. Martinez explained that a suspension process and a Fit for Duty process had both been underway and had become intertwined, and that multiple internal processes had been occurring at the same time.

232. Mr. Martinez informed Plaintiff that he would be returned to work in good standing, would receive a new manager, and could be supported through a temporary work-from-home arrangement.

233. Plaintiff alleges that Amazon's decision to return him in good standing confirms that the months-long suspension, investigation, restrictions, and uncertainty were unnecessary, excessive, and retaliatory.

234. On May 22, 2026, after being told he was returned to active status, Plaintiff attempted to enter BOS21 because his Amazon-issued laptop was not functioning properly.

235. Plaintiff was denied entry, told he could not enter the building under any circumstances, and had his employee badge confiscated.

236. Plaintiff believed at the time that he may have been terminated or that Amazon had reversed its decision to return him to work.

237. Plaintiff later learned from Mr. Martinez that Amazon had failed to complete a necessary administrative process connected to Plaintiff's return-to-work status.

238. Plaintiff alleges that the May 22 building-access denial and badge confiscation caused further unnecessary emotional distress and demonstrated the continuing consequences of Amazon's mishandling of his employment status.

239. Plaintiff returned to work but continued to experience anxiety, trauma-related symptoms, distress associated with BOS21, distress associated with individuals involved in the events, and fear that Amazon could again mishandle his employment status.

## DAMAGES

240. As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe emotional distress, anxiety, panic symptoms, humiliation, embarrassment, hypervigilance, sleep disruption, trauma-related symptoms, difficulty concentrating, and loss of enjoyment of life.

241. Plaintiff sought crisis evaluation, was admitted for crisis stabilization, received psychiatric care and counseling, and required medication management and treatment planning.

242. Plaintiff incurred medical expenses and treatment-related costs.

243. Plaintiff suffered financial hardship, including pay disruption, debt-related harm, fear of eviction, difficulty accessing benefits and employment systems, delayed stock or RSU-related compensation, and other compensation-related harm.

244. Plaintiff suffered reputational harm, including humiliation in front of coworkers, confusion about his employment status, and the appearance that he was mentally unstable, medically unfit, or subject to disciplinary action.

245. Plaintiff suffered workplace harm, including removal from active work, restriction of access, loss of ordinary employment opportunities, lost promotion opportunity, disruption of career progression, lost compensation growth, lost bonus or equity opportunities, lost stock or RSU-related compensation, lost seniority, and ongoing anxiety related to his workplace and employment status.

246. Plaintiff seeks compensatory damages, emotional-distress damages, economic damages, damages for lost promotion opportunity, lost career progression, lost compensation growth, lost bonus or equity opportunities, lost stock or RSU-related compensation, lost seniority, equitable relief, costs, interest, and all other relief available under federal and Massachusetts law.

## COUNT I
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12203

247. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

248. Plaintiff engaged in protected activity by disclosing disability-related concerns, requesting and taking mental-health-related leave, reporting workplace harassment and disability-related treatment to management, filing Ethics complaints, requesting assistance, and objecting to conduct he reasonably believed was unlawful.

249. Defendant knew of Plaintiff's protected activity.

250. Defendant subjected Plaintiff to adverse actions, including detention, medical questioning, EMS involvement, removal from the workplace, paid suspension, Fit for Duty review, system restrictions, prolonged investigation, administrative leave, failure to provide clear information, lost promotion opportunity, delayed stock or RSU-related compensation, disruption of career progression, and post-return building-access denial and badge confiscation.

251. The adverse actions occurred in close temporal proximity to Plaintiff's protected activity and would dissuade a reasonable employee from reporting discrimination, harassment, retaliation, or disability-related concerns.

252. Plaintiff alleges that Defendant's adverse actions were causally connected to his protected activity and violated the ADA.

## COUNT II
## DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12112

253. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

254. Plaintiff had actual or perceived mental-health conditions, including anxiety, depression, and trauma-related symptoms, and Amazon had knowledge of those conditions through Plaintiff's disclosures, leave, medical documentation, Disability and Leave Services records, management communications, and internal security reports.

255. Plaintiff was qualified to perform the essential functions of his position, as shown by his record of promotions, performance, lack of discipline, and Amazon's eventual decision to return him to active employment in good standing.

256. Defendant treated Plaintiff adversely because of actual or perceived disability by questioning him about mental-health conditions, removing him from the workplace, suspending him, placing him into Fit for Duty review, restricting his access, keeping him out of work for approximately five months, interrupting his promotion trajectory, and delaying or impairing stock or RSU-related compensation.

257. Defendant's actions caused Plaintiff damages and violated the ADA.

## COUNT III
## IMPERMISSIBLE DISABILITY-RELATED INQUIRY AND MEDICAL EXAMINATION
## 42 U.S.C. § 12112(d)

258. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

259. On December 5, 2025, Defendant questioned Plaintiff about his mental-health condition, psychiatric treatment, diagnoses, medications, providers, and treatment history.

260. Defendant summoned EMS and initiated a Fit for Duty process after Plaintiff reported workplace concerns and disability-related distress.

261. Plaintiff alleges that the inquiries and compelled medical review were not job-related and consistent with business necessity, were not narrowly tailored, and were based at least in part on stereotypes or assumptions regarding mental-health conditions.

262. Defendant's conduct violated 42 U.S.C. § 12112(d) and caused Plaintiff damages.

## COUNT IV
## DISABILITY DISCRIMINATION IN VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 151B

263. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

264. Plaintiff had actual or perceived disabilities within the meaning of Chapter 151B, including anxiety, depression, and trauma-related symptoms.

265. Defendant knew or should have known of Plaintiff's disability-related conditions and recent mental-health-related leave.

266. Plaintiff was capable of performing the essential functions of his position with or without reasonable accommodation.

267. Defendant discriminated against Plaintiff by treating him as a security and medical threat, removing him from active work, suspending him, restricting access, extending the Fit for Duty and investigative process, mishandling his return to active status, interrupting his promotion process, and causing equity- and compensation-related harm.

268. Defendant's actions caused Plaintiff damages and violated Chapter 151B.

## COUNT V
## RETALIATION IN VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 151B

269. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

270. Plaintiff engaged in protected activity under Chapter 151B by reporting disability-related treatment, workplace harassment, intimidation, retaliation, and emotional distress to management and through Amazon's Ethics process.

271. Defendant knew of Plaintiff's protected activity.

272. Defendant subjected Plaintiff to materially adverse actions including detention, mental-health questioning, EMS involvement, removal from the workplace, suspension, Fit for Duty review, system restrictions, prolonged investigation, administrative leave, lost promotion opportunity, delayed stock or RSU-related compensation, disrupted career progression, and later building-access denial and badge confiscation.

273. The timing and circumstances support an inference that Defendant retaliated against Plaintiff for protected activity.

274. Defendant's retaliation caused Plaintiff damages and violated Chapter 151B.

## COUNT VI
## FALSE IMPRISONMENT
## MASSACHUSETTS COMMON LAW

275. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

276. On December 5, 2025, Defendant, through its agents and representatives, intentionally confined Plaintiff in a BOS21 conference room.

277. Plaintiff requested permission to leave and requested permission to obtain water, but his requests were denied.

278. Plaintiff informed those present that he believed he was being detained and reasonably believed he was not free to leave.

279. Plaintiff alleges that Defendant lacked lawful justification for the confinement.

280. Defendant's conduct caused Plaintiff fear, humiliation, anxiety, emotional distress, and other damages.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## MASSACHUSETTS COMMON LAW

281. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

282. Defendant knew that Plaintiff had recently returned from mental-health-related leave, had disclosed anxiety and depression, and had reported panic symptoms and workplace-related distress on December 4, 2025.

283. Despite that knowledge and Plaintiff's reports about Mr. Dolan's reckless, investigation-related workplace conversations, Defendant detained Plaintiff, questioned him about private mental-health matters, summoned EMS, interrupted a business meeting in front of colleagues, removed him from the workplace, suspended him, initiated Fit for Duty review, restricted his access, and kept him in prolonged uncertainty for approximately five months.

284. Defendant then mishandled Plaintiff's return by permitting him to be denied building access and to have his badge confiscated after he had been returned to work in good standing.

285. Plaintiff alleges that Defendant's conduct, viewed as a whole, was extreme and outrageous, went beyond all bounds of decency tolerated in a civilized workplace, and was intended to cause or recklessly disregarded the likelihood of causing severe emotional distress, humiliation, career disruption, and economic harm.

286. Plaintiff suffered severe emotional distress, crisis stabilization, psychiatric treatment, trauma-related symptoms, medical expenses, financial hardship, lost promotion and compensation opportunities, humiliation, and reputational harm.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## MASSACHUSETTS COMMON LAW
## PLED IN THE ALTERNATIVE

287. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

288. Plaintiff pleads this count in the alternative to Count VII.

289. Defendant owed Plaintiff a duty to exercise reasonable care in responding to his workplace complaints, disability-related disclosures, mental-health information, medical information, security response, Fit for Duty process, investigation, suspension, and return-to-work process.

290. Defendant breached that duty by mishandling Plaintiff's December 4 reports about Mr. Dolan, detaining and medically questioning him on December 5, summoning EMS in a humiliating manner, removing him from work, placing him into a prolonged and confusing process, failing to communicate clearly, disrupting his promotion and compensation opportunities, and failing to timely correct administrative restrictions after returning him to active employment.

291. Defendant knew or should have known that its conduct could cause serious emotional harm, particularly because Plaintiff had recently returned from leave and reported panic symptoms and distress.

292. Defendant's negligence caused Plaintiff emotional distress accompanied by objective psychological, physical, and treatment-related manifestations, including panic symptoms, sleep disruption, hyper-vigilance, trauma-related symptoms, crisis stabilization, psychiatric treatment, medication management, counseling, and treatment-related costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cameron Lacroix respectfully requests that this Court enter judgment in his favor and against Defendant Amazon.com Services LLC and grant the following relief:

A. A declaratory judgment that Defendant's conduct violated the Americans with Disabilities Act;

B. A declaratory judgment that Defendant's conduct violated Massachusetts General Laws Chapter 151B;

C. A declaratory judgment that Defendant's conduct constituted false imprisonment under Massachusetts common law;

D. A declaratory judgment that Defendant's conduct caused legally compensable emotional distress under Massachusetts common law;

E. Compensatory damages in an amount to be determined at trial;

F. Damages for emotional distress, humiliation, embarrassment, anxiety, trauma-related symptoms, pain and suffering, and loss of enjoyment of life;

G. Economic damages, including lost income, lost benefits, out-of-pocket losses, medical expenses, treatment-related expenses, debt-related damages, lost promotion opportunity, lost career progression, lost stock or RSU-related compensation, delayed stock-vesting or RSU awards, lost seniority, and other employment-related economic losses;

H. Damages for reputational harm;

I. Punitive damages to the extent permitted by law;

J. Pre-judgment and post-judgment interest;

K. Costs and reasonable attorneys' fees to the extent permitted by law;

L. Appropriate equitable relief, including relief necessary to correct employment records, remove improper restrictions, restore benefits, protect Plaintiff from retaliation, prevent further unlawful treatment, restore or adjust stock/RSU vesting or awards, and provide fair promotion and career-progression consideration; and

M. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 16, 2026

- 30 -

Respectfully submitted,

Cameron Lacroix
Plaintiff, Pro Se
PO Box 620144
Newton, MA 02462
617-539-6662
cameronlacroix@proton.me

C2 6/16/2026